NICK DISALVO, Administrator, Appellee, v. CHICAGO, ROCK
ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

**NEGLIGENCE:** Acts Constituting—Unallowable Inference. Negligence
1. on the part of a switching crew may not be inferred on a record
showing that a slight movement of a car was made in the custom-
ary manner, and without knowledge or duty to know of the pres-
ence of the injured employee; and especially is this true when the
employee was injured at a place where, apparently, he had no duty
to perform.

**TRIAL:** Instructions—Copying Unsupported Issues. The *oft repeated*
2. practice of copying into the instructions the issues as recited in the
petition when *some* of the issues are wholly without support in the evi-
dence is *again* condemned, and the *oft repeated* rule not to mention or
submit any issue unless it has support in the evidence is *again*
pressed upon the attention of trial courts.

Headnote 1: 26 Cyc. p. 1454. Headnote 2: 38 Cyc. pp. 1617, 1621.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

NOVEMBER 11, 1924.

SUPPLEMENTAL OPINION MARCH 21, 1925.

ACTION at law, under the Federal Employers' Liability Act,
to recover damages for the death of plaintiff's intestate. The
defense was a general denial and a plea of contributory negli-
gence and assumption of risk. There was a verdict for the plain-
tiff; and judgment entered thereon. The defendant has ap-
pealed.—*Reversed.*

*J. G. Gamble, R. L. Read,* and *A. B. Howland,* for appel-
lant.

*Clark & Byers* and *Gregory Brunk,* for appellee.

EVANS, J.—I. The plaintiff is the administrator of the estate
of Angelo Cacciatore, who lost his life while in the employ of
the defendant. On this appeal, the defendant appellant stresses

1. NEGLIGENCE: acts constitut-ing: unallowable inference.

two points: (1) That the evidence fails to show
that the deceased was employed in interstate
commerce at the time of the accident; (2) that

the evidence fails to show any negligence on the part of the defendant or its employees.

The deceased had been in the employ of the defendant for nine years. His place of work was in and about the freight yard. The character of his work was miscellaneous. He is referred to in the record as the ''handy man.'' He met the emergencies of small repairs, either as pertaining to the cars or to parcels of freight contained therein. If a car door became out of order, so that it could not be securely closed and sealed, he cleated it; if cratings of freight were out of order, he repaired them; if the car included breakable freight, such as glass, or dangerous freight, such as dynamite, he blocked the parcels securely in place, so that there could be no shifting or colliding.  Other miscellaneous duties fell to him, either upon the order of the foreman or upon his own initiative, as the need of the moment might be observed by him. He was an experienced, efficient, and trustworthy employee, who at all times carried his hammer on his person, and died with it in his hand.

On the evening of February 14, 1921, about 6:25 o'clock, his body was found lying astride the rail, between two cars, with one car wheel partly upon the body, whereby the pelvic bones had been crushed. No one saw the accident, and the method of it must be inferred only from other circumstances. He was last seen at 5:30 P. M.  The circumstances are persuasive that he met his death at 5:40 P. M.  There is no direct evidence as to what the deceased was doing or attempting to do at the time of the accident; nor is there any direct evidence of negligent acts on the part of other employees.  As to these matters, plaintiff relies upon circumstantial evidence.  The consideration of these circumstances requires a somewhat extended statement of the surroundings of the deceased and of the method of work and duties of his coemployees.

The place of accident was at the freight yard of the defendant.  This yard extends east and west for a distance of two city blocks.  Its eastern terminus extends to Ninth Street, and its western terminus to Eleventh Street, in the city of Des Moines.  This yard is occupied by five switch tracks.  They are all closed at the east end.  Each opens at its west end into the ''lead'' track.  This ''lead'' track lies on the north side of the

yard. Switch track No. 1 lies at the south side of the yard; switch tracks Nos. 2, 3, 4, and 5 lie to the north of track No. 1, in this respective order. The distance between these switch tracks is such as to leave a space of three feet between the cars on the respective tracks. Between switch tracks Nos. 3 and 4 there is a so-called "middle platform," which extends for the full length of the yard, the floor thereof being on the level of the car floors. On the south side of the yard is a freight house; and likewise on the north side, another freight house. Freight delivered to the railroad company for shipment is received at the south freight house; freight delivered at Des Moines destination is unloaded at the north freight house. Cars are "spotted" upon the switch tracks pursuant to a definite system. For the purpose of this system, each switch track is divided into "spots," or sections. A "spot" is that section of the switch track which is devoted to a specific car. A specific number is applied to each "spot." For instance, switch track No. 1 had a capacity for 13 cars: it had, therefore, 13 "spots." On this track, these "spots" were numbered consecutively from "Spot" 1 to "Spot" 13. Switch track No. 2 had capacity for 14 cars, and its "spots" were likewise numbered consecutively, beginning with "Spot" 21. Switch track No. 3 likewise had 14 "spots," beginning with "Spot" 41. The beginning point of each track was at the east end; so that the first cars on Switch Tracks 1, 2, and 3 occupied respectively "Spot" 1, "Spot" 21, and "Spot" 41. One objective of this division into "spots" was that the car doors on the respective tracks should at all times be opposite to each other. Steel bridges were laid down between the cars. In this manner, passageway was always open to pass through the cars, if necessary, from one side of the yard to the other; and the middle platform and freight houses became thereby accessible to the cars on each track. Work in the yards during the day consisted of that of freight handlers. The spotting of the cars preliminary to the work of the freight handler was all done the night or evening before. During the working hours of the freight handlers, no movement of the cars was had. The switch engine came to the yard, for the purpose of moving the cars, at 5:30 P. M., and not before. The loading of the cars stopped at 5:00 P. M. At that hour, it became the duty of the freight handlers to

close and seal all loaded cars.  They began such work at the east
end of the yard, and followed it through to the west end, at
which point each reported to the foreman, and left the yard.  If
any breakage or defects were reported to the foreman, he called
upon Cacciatore for the mending.  He was not a freight handler;
but the nature of his duties was such as often to detain him after
the quitting time of the freight handlers.  On the evening in
question, the south car door of ''Spot'' 48 on Track 3 was re-
ported out of order and in need of cleating.  The foreman or-
dered Cacciatore to do the cleating.  At that time, Cacciatore
was at ''Spot'' 41, being at the east end of Track 3, and was
on the middle platform.  He started west along the platform
towards ''Spot'' 48.  This was at 5:30 P. M.  After he started
towards ''Spot'' 48, he was not again observed by anyone.  He
never arrived at ''Spot'' 48.  What caused him to change his
purpose and course is not known; nor are there any circum-
stances made apparent which furnish any explanation at this
point.  His body was found at 6:25, as already indicated, astride
the south rail of switch track No. 2, between the third and the
fourth car from the east end.  These occupied, respectively,
''Spots'' 23 and 24.  These cars were disconnected, and their
bumpers were about two feet apart at the time the body was
found, and the ends of the cars were 5 or 6 feet apart.  Caccia-
tore's watch, which had been broken, stopped at 5:40.  It appears
also that, about 5:40, the switch engine had coupled to the rear
car on track No. 2 at its west end, and that such coupling neces-
sarily involved some impact.  These circumstances warrant the
inference that there was a movement of the intervening cars up
to and including ''Spot'' 24, and that this was the movement by
which Cacciatore became pinned under the car wheel.  Under
the evidence, this movement must have been slight, and could
not have exceeded a foot or two.  There is no showing that the
car, when the body was found, was out of its proper position with
reference to other cars.  It is also apparent that the impact was
not transferred to Car 23.  The deceased was not caught by con-
tact of the bumpers.  The body lay with the head to the east
and the limbs astride the south rail; the car wheel came to and
upon the pelvic bones.

The foregoing is the substance of all the evidence that bears

upon the circumstances of the accident. The question confronting us is to find in this record sufficient evidence of negligence, circumstantial or otherwise, to sustain the verdict rendered for the plaintiff. It is said in the argument that the cars were pushed violently by the switch engine; but we find no evidence that they were pushed in any other than the usual and customary manner. This also answers the contention that the switch-engine crew pushed the cars without first ascertaining whether Cacciatore was at that time between the cars. There is no showing that any such duty rested on the crew, nor any showing that the imposing of such a duty would be practicable. So far as known, Cacciatore had no duty to perform at that time upon track No. 2. If it was the duty of the switch-engine crew to locate and discover Cacciatore at this particular time before moving a car, then it would have been equally incumbent upon them at all times, either to find him before moving any car, or else to inspect the rear end of every car before moving same. There is no claim that such a course was customary or usual. Nor is it easily credible that such a course could be deemed practicable. The long service of the deceased in that yard necessarily made him familiar with the usual methods of the switch engine and its crew. In coupling to the car at the westernmost end on track No. 2, the switch crew did nothing out of the ordinary, so far as appears from this record.

By Instruction 11, the trial court permitted the jury to find whether the foreman had given an order to Cacciatore which would require him to go between the cars which were being prepared for transportation, and whether such foreman exercised ordinary care in preventing the movement of the cars which would or might injure the deceased. There is no evidence in the record that the foreman had given to Cacciatore any order which contemplated his crossing track No. 2. He was called to "Spot" 48 on Track 3. No other order was given him. There was no basis, therefore, in the evidence for Instruction 11. The same is to be said concerning Instruction 12, whereby the jury was permitted to find whether the switching operations were begun "before or at or about the usual and customary quitting time of the plaintiff, and if before, whether they used ordinary care to warn the

2. TRIAL: instructions: copying unsupported issues.

plaintiff that they were beginning to move said cars." The evidence is without dispute that the switch engine always began its work at or about the usual quitting time of the deceased; it came to the yard for no other purpose than to move cars; its coming was apparent, and its purpose was known to the deceased; it came at its usual time, and began its work at the usual time. There is nothing in the evidence which tends to show any departure of the switch crew from the usual and ordinary method of doing its work. We are constrained to the conclusion, therefore, that the evidence wholly fails to disclose any act of negligence on the part of the employees of the defendant. The fact that no one saw the accident or the circumstances thereof makes the case analogous to our recent cases, *Jackson v. Hanrahan*, 198 Iowa 704; *Hall v. Chicago, R. I. & P. R. Co.*, 199 Iowa 607; *Lambrakis v. Chicago, R. I. & P. R. Co.*, 198 Iowa 641.

II.   Our foregoing conclusion requires a reversal of the case. Such order of reversal will award the defendant a new trial. Manifestly, a new trial would be useless unless the plaintiff is able to produce new evidence on new trial in proof of negligence. If such evidence should be produced, it may be of such a nature as to cast light also upon the question whether the decedent was employed in interstate commerce at the time of the accident. For the purpose of this appeal, it is not necessary that we pass upon that question. If new evidence shall be produced upon a second trial, it is our preference to make pronouncement on that question in the light of such new evidence.

III.   The petition of the plaintiff enumerated eleven grounds of negligence. These grounds were all submitted to the jury in the form of a statement of issues. The petition was lengthy, and was submitted to the jury by the court almost verbatim. By Instructions 11 and 12, the trial court called specific attention to the two grounds of negligence stated. No other grounds were thus specifically referred to. We infer from this fact that the trial court did not regard the other nine grounds charged in the petition as having any support. But none of them were withdrawn from the consideration of the jury. On the contrary, all these grounds were, in terms, submitted to the jury by Instruction 4, Subdivision 2 thereof, as follows:

"2.   That defendant, through its employees, was negligent

in one or more of the particulars alleged in the petition and set forth in the paragraphs numbered from 1 to 11, inclusive, of the preceding statement of the issues.''

Complaint is made of this method of submission to the jury. The complaint is well founded, and the error should be avoided upon a subsequent trial. The practice of submitting lengthy pleadings to the jury is one which we have strongly disapproved repeatedly. We have tolerated the practice if and when the trial court follows such recital of unproved allegations with an express withdrawal of those that are not sustained by the evidence. The better practice is that unsupported allegations should not be submitted to the jury, even in a statement of issues. If, however, the trial court prefers to include in a statement of issues all the allegations of a pleading, then there ought to be an express and affirmative withdrawal of all allegations which are without support in the evidence.

The judgment below is reversed.—*Reversed*.

ARTHUR, C. J., and PRESTON and FAVILLE, JJ., concur.

### SUPPLEMENTAL OPINION.

It is earnestly complained that appellee's theory of the case must have been overlooked, in that it is ignored, as claimed, in the opinion. Such theory now emphasized is that, though Cacciatore was ordered from Car 41 to Car 48 on Track No. 3, yet he may have crossed Track No. 2 in quest of material for his cleats. The only evidence upon which this conjecture is based is that he had his material distributed at different points in the yard, including the south freight house as one of the points. The theory thus put forward is itself a departure from appellee's pleading in the court below. The appellee's petition alleged that the foreman ''ordered the said Cacciatore to take his tools, consisting of hammer and nails and other tools, from the point where he was then standing, *across several tracks of the defendant to a certain car loaded with freight* for destination outside of Iowa, in order to fasten said car up preparatory to its being taken out by the switch engine and placed in a train

to be taken to its said destination. That there were also numerous cars located upon the tracks which the plaintiff's decedent was *obliged to cross in order to reach the car in question.* * * * That, while plaintiff's decedent was either *proceeding to the car* in order to fasten up the same, so that it could proceed on its journey, or while he was *returning* across the tracks of the defendant to a point from which he originally started, a switch engine of the defendant was, without any warning to the plaintiff's decedent * * *''

The theory put forth by these allegations was that the deceased was either proceeding to Car 48, pursuant to order, or was returning therefrom to his original starting point, Car 41.

Though our opinion filed is more directly responsive to the appellee's pleading, nevertheless we did and do find that the evidence was insufficient to sustain a recovery upon any theory.

The petition for rehearing is overruled.

FAVILLE, C. J., and ARTHUR and ALBERT, JJ., concur.