NICK DISALVO, Administrator, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

APPEAL AND ERROR: Decision—Law of Case—Same Evidence on Retrial. A holding on appeal of insufficiency of evidence to present a jury question on an issue necessarily controls a retrial on the same evidence.

Headnote 1: 4 C. J. p. 1111.

Headnote 1: 2 R. C. L. 228 *et seq.*

*Appeal from Polk District Court.*—HUBERT UTTERBACK, Judge.

MAY 3, 1927.

Action to recover under the Federal Employers' Liability Act for the death of plaintiff's intestate. There was a verdict for the plaintiff, and defendant appeals from the judgment thereon.—*Reversed.*

*J. G. Gamble* and *R. L. Read,* for appellant.

*Clark & Byers* and *Gregory Brunk,* for appellee.

VERMILION, J.—This case was before us on a former appeal. The opinion will be found in 199 Iowa 868, where the circum-. stances of the occurrence, the physical facts, and the evidence adduced on the first trial are fully set out. We shall endeavor to avoid unnecessary repetition.

It was held on the former appeal that there was no sufficient evidence of negligence on the part of the defendant to take that question to the jury, and a judgment for the plaintiff was reversed, and a new trial awarded. We said:

"Manifestly, a new trial would be useless unless the plaintiff is able to produce new evidence on new trial in proof of negligence."

The former opinion is the law of the case, upon the facts then presented. The principal question arising on this appeal is whether, upon the second trial, evidence, in addition to that presented on the first, or tending to establish facts different from those then shown, was introduced, supporting the charge of negligence and warranting the submission of the case to the jury.

The lower court on the last trial submitted but a single charge of negligence: whether the defendant, through its employees, was guilty of negligence, under all the circumstances shown, in suddenly moving the car that killed the decedent, without in some manner warning him that it was about to be moved.

Several witnesses were produced by the plaintiff on the last trial who were not heard on the first. From a careful reading of the record, it is quite apparent that any new evidence of negligence, or evidence of additional facts from which negligence might be inferred, must be found, if at all, in the testimony of two witnesses, Saylor and Chicchelly.

Saylor was the freight yard foreman. He testified that he directed another employee, Lambert, to tell decedent to cleat the south door of the car on "Spot" 48; that this was at about 5:25; that he (the witness) was then at the west end of the center platform, and went around the west end of the tracks to the south freight house; that the cars on the west end of Track 3 were to be the first cars out of the yard. He further testified that he had nothing to do with the operation of switching or directing of the switching, except that a switch list giving the destination of each car was made out and given to the switch foreman every night. He said:

"Beyond that, I gave no direction of any kind to the switch foreman. He worked on his own responsibility, assuming that the house was ready at a certain time. The switching commenced at 5:30, as a regular thing. There may have been some exceptions, where we were held for a few minutes on account of taking care of rush shipments, but, as a general thing, it was 5:30. The cars were supposed to be closed and the doors sealed by 5:30."

The testimony of Chicchelly was to the effect that he was employed in the freight yard in trucking freight; that, after the work of trucking was finished, it was his duty to cleat the doors of cars on the tracks south of the center platform; that, on the evening when decedent was killed, he began the work of cleating the car doors at about 20 or 25 minutes after 5 o'clock; that he cleated the south door of the car on Spot 48 at about 5:30; and that he had cleated all the doors that needed it in the first and second "ditches," or spaces between the tracks, and was on the south platform, going toward the office, when he heard the impact of cars to the north, and remarked to himself that "they must be in a hurry."

It thus appears, as it did on the first trial, that the decedent was directed, at about 5:25, to cleat the door on the south side of the car on Spot 48, the eighth car from the east on Track 3. It is now undisputed that he did not do so, for that was done by Chicchelly at 5:30. The record still, as on the former trial, affords no explanation of the presence of decedent at the point where he was killed by the car on Spot 24, between the third and fourth cars from the east end of Track 2.

It appears, as it did on the former trial, that decedent's watch had stopped at 5:40, and from the testimony of members of

the switching crew, that the switching operation that caused the fatal movement of the car on Spot 24 occurred at 5:40. But it is now shown, without dispute, that Chicchelly, beginning at 5:20 or 5:25,—not over five minutes before the order was given decedent to cleat the door of the car on Spot 48,—had traversed the length of the yard twice, cleating all doors that required it in the two ditches, including the one on Spot 48, and was on the south platform in a place of safety at 5:40, when the switching movement was made.

The charge of negligence submitted to the jury, in the ultimate analysis, is that it was the duty of the yard foreman or the switching crew to know that the yard was clear of those employed there before the switching operation was commenced, and that the failure to do so was negligence. This question was discussed in the former opinion. The appellee seeks to avoid the effect of that holding by the contention that there is now evidence that that duty rested upon the yard foreman. This is claimed to appear from his testimony that, in exceptional cases, where the work of loading freight was delayed, the switching did not begin at 5:30, nor until the work in the yard was done, and that he left the west end of the center platform at 5:25. It is earnestly insisted that evidence of his authority and duty in this respect is to be found in the following testimony given by him:

"Q. Now, if you had been on the middle platform on the evening of the 14th day of February,—the west end of it,— February, 1921, with the switch engine on the lead, waiting to take out the cars to go into the Kansas City train, and had known that Cacciatore or that any other man was working on that door, Car 48, would you have permitted them to have bumped into that string of cars? A. I would not,—no, sir."

The question asked related not to any duty on his part to know that all employees were out of the yard, or to his authority to control the switching of cars, but to what he would have done in the face of a known danger to an employee. But it is undisputed that switching did not begin and the fatal movement of the cars on Track 2 did not occur for 15 minutes after he had directed decedent to cleat the door of the car on Spot 48, and that, within that interval, or, at most, 5 minutes longer, the work of cleating all the doors requiring it along two of the ditches, including that which decedent had been directed to

cleat, had been completed by Chicchelly, and he had reached a place of safety. It is undisputed that decedent was experienced in the work of the freight yard; his duties were various; he worked "on his own;" he did not need supervision, and frequently worked after the usual closing time. There is nothing in the record from which it could be inferred that any duty rested upon the yard foreman to see that he was out of the yard before the switching crew began work.

There was testimony that, when it was intended to pull a number of cars from one of the tracks, one of the switching crew would pass along the cars to be moved, for the purpose of inspecting the couplings, or opening the knuckles, if the cars were uncoupled, before the engine was run against the first car. It is said that, had this been done before the fatal movement, the decedent's peril would have been discovered, or he would have been warned. But it is without dispute that the cars on Track 3 were to be the first removed from the yard. The west car standing on Track 2, however, did not clear Track 3, and the switching movement on Track 2 that caused decedent's death was for the purpose of removing the one car that blocked the way to Track 3; and there was then no occasion for the switching crew to inspect the cars farther to the east on Track 2. We said in the former opinion:

"There is nothing in the evidence which tends to show any departure of the switch crew from the usual and ordinary method of doing its work."

This is equally true of the present record.

We think there was no evidence of negligence on the part of the defendant, and that its motion for a directed verdict should have been sustained.

In this view of the case, there is no need to discuss other errors assigned.

The judgment is—*Reversed.*

EVANS, C. J., and STEVENS, FAVILLE, and KINDIG, JJ., concur.