Alfred Smith, Appellee,. v. Chicago, Burlington & Quincy Railroad Company, Appellant.

No. 45664.

December 9, 1941.

Miller & Claussen, Homer I. Smith, and E. E. Hairgrove, for appellee.

Frank W. Ellis, Lane & Waterman, and Clark, Pryor, Hale & Plock, for appellant.

Mitchell, J.—This is a railroad crossing case in which the automobile,. in which Alfred Smith, plaintiff, was riding as a front seat passenger, collided with the side of a gasoline motor-car owned and operated by the Chicago, Burlington & Quincy Railroad Company, the defendant. This is the second time that this case has been before this court. The prior appeal involved only the question of whether the lower court was right in sustaining the demurrer of the defendant to the petition. See Smith v. Chicago, B. & Q. R. R. Co., 227 Iowa 1404, 291 N. W. 422.

In the case at bar the trial court refused to direct a verdict and the jury returned one in favor of the plaintiff. The defendant Chicago, B. & Q. R. R. Co. has appealed.

The accident occurred at the intersection of U. S. highway 80 and the appellant's railroad tracks in Whiteside County, Illinois. The said paved highway number 80 runs due north and south in the vicinity of said crossing. That the railroad tracks cross said highway in a northwesterly and southeasterly direction. That said paved highway number 80 was straight and level for a distance of 2,000 feet south of appellant's track. Both the highway and the railroad are built on grades but apparently are at about the same level. There was a prewarning sign made of metal with glass reflectors in it. It was located 337 feet south of the center line of the Q. track. It was a disc sign 18 inches in diameter marked "Railroad Crossing." It is located 10.2 feet east of the east edge of the hard road. There was also on the north and south side of the railroad track railroad crossing signs. These are concrete posts with cross bucks or bars on them. These cross bucks or bars are about 5 feet in length. At the top the spread is about 5 feet. Each bar is a little over 9 inches in width. One of these crossbars is painted in black letters, "Railroad" and the other is painted "Crossing." Inside these black lines are reflector bottoms. The top of the crossbars is 13 feet above the concrete slab of the paved highway. The cross bucks form an X laid on its side rather than standing up straight; that is, the narrow part is perpendicular. The cross buck with the sign "Railroad Crossing" on it is 15 feet and 6 inches on the south side of the crossing from the center of the railroad track and 6 feet 3 inches east of the east edge of the paving. The railroad tracks are 4 feet 7 inches apart.

The concrete slab on route 80 was 20 feet wide. Highway 80 is crossed by the railroad at grade. The railroad track and also route 80 are on a fill, between 10 and 12 feet deep. South of the railroad track and east of the hard road is a low swampy piece of ground.

We shall next describe the motorcar. It is 78 or 79 feet long and a little over 9 feet wide. The highest point is about 14 feet and the roof about 12 feet. It is referred to some places

in the evidence as a scooter and motorcar but the correct designation is gas-electric-motorcar. There are several compartments. Beginning at the front end of the car, the first compartment is the engine room. It is about 8 feet long and runs the width of the car. There are doors on both sides, one window in front and one on each side of the engine compartment. Next to the window on the side of the motor compartment and in the motor compartment is a door which extends from the floor to the roof of the car. The engine compartment contains the proper machinery for the motorcar. The controls are located on the right-hand side. In the compartment is a 275-horsepower engine and a 600-volt generator. The gas engine operates the generator and that in turn produces the electric current for the power for the motorcar. The gasoline is carried in a 250-gallon tank on the left side, just a little back of the mail compartment door underneath the car. It is about 10 feet long. In the motor compartment there is a dash light and a light directly above the engine. When the car is running, the only light on in the motor compartment is the dash light.

The mail compartment is immediately to the rear or back of the engine compartment. It is about 16 feet long. It runs the width of the car. There are lights in the mail compartment, one over each door and lights so that the mail clerks can do their work, which necessitates reading of the addresses on the mail that they must sort. There is one side door on each side of the mail compartment. These doors are about 2¼ feet wide and about 6 feet high and there are two windows on each side of the mail compartment.

A baggage and express room is directly back of the mail compartment and is about 25 feet long and the width of the car. There is one door on each side of the baggage and express room. These doors are described as being about 7 feet wide and extend from the floor to the roof of the car.

Back of the baggage compartment is the passenger compartment. There are windows along both sides of that compartment. These windows extend clear to the back, beginning at the front end of the passenger compartment. The back seat is about 6 feet from the rear end of the train. At the back end of the train on each side there are doors for people to get in and

out of. There are lights burning in the mail compartment, the baggage and express compartment, and in the passenger compartment of the train and the doors in the baggage compartment were open. The train has a headlight on the front end that throws a light about 300 yards ahead of the train.

At the time of this accident this motorcar was running as a regular train. On July 9, 1938, Louis Housenga came over to the farm at which appellee was working and in his 1930 Chevrolet picked him up. Housenga had prior to that time picked up the sister of the appellee and she was in the car when he got into it. They drove over to Fulton. From there they drove over route 80 to Albany, which is a paved road that extends south from Fulton. In doing so they crossed the tracks of the C. B. & Q. where the accident later happened. It was still daylight at this time. At Albany they attended an open-air moving picture show and then started back over route 80 to Fulton. Housenga was seated on the left-hand side and was doing the driving. Alfred Smith was on the right-hand side and his sister in the center. It was a two-seated car; all three were riding in the front seat. They started back the same way they had come. Housenga lighted his headlights at Albany. They were driving about 40 miles an hour after they left Albany. Alfred Smith was playing a mouth organ up until the time that they reached what is referred to in the evidence as the curve in the road just before they reached the straight part that leads up to the railroad crossing. Smith testified that when they reached the curve he put the mouth organ in the pocket of the car. They had been driving at the rate of 40 miles per hour but slowed down a little for the curve but when they reached the straight part of the road again the speed was increased to about 40 miles per hour. They were driving directly north, the headlights of the Housenga car were lighted and while it was dark, the night was clear and visibility good. That they were not talking. That the headlights on the Housenga car were lighted and the first he saw of the railroad train was what he described as "When a shadow came out in front of the car. The shadow came from the right side of the road." The Housenga car crashed into the side of the Burlington train, bending in the step directly under the mail compartment door, which is approximately 10 feet

from the front end of the car. There is some little dispute in the evidence as to just exactly what part of the intersection of the railroad track and the paved road the train was on at the time of the collision. Most of the witnesses place the front end of the train completely across the pavement but there is some evidence that the front end of the train was about 8 feet west of the center line of the paved road. The evidence also shows that Housenga turned slightly to the left as he crashed into the train.

Now for the operation of the train. When it reached the east side of the pavement, it came to a stop, the motorman testifying that he looked to the south to see if there were any automobiles approaching and he saw none. He then started the train. It is his testimony that the train was traveling at the rate of a mile an hour. The motorman did not see the car in which Smith was riding as it came north on the pavement. The evidence shows that the headlight was burning, that the dash light in the motor compartment of the train was lighted, that the lights in the mail, baggage and the passenger compartments of the train were lighted and that the doors in the baggage compartment were open. There were two or three automobiles on the north side of this intersection that had stopped to let the train pass. The drivers of these cars all saw the train, and stopped on that account. There is evidence of several witnesses that there was an automobile stopped on the south side of the track and that the Housenga car went around this car. However, if there was an automobile stopped there, the driver or occupants of that car were not produced as witnesses. The appellee's main witness, John Scott, stopped his car on the north side of the crossing. He testified in regard to the lights, but it is interesting to note that his car was 700 feet from the railroad crossing and he was able to see the lights in the train although he describes them as dim. There is a conflict in the evidence as to whether a bell or other warning was given by the train as it started across the intersection. There is also a conflict in the evidence in regard to whether or not the warning sign, 337 feet from the railroad track, was concealed by brush and shrubbery and whether or not there was brush and shrubbery along the right of way of the appellant's track. The evidence shows that the appellee had driven over this

track on other occasions and that on the very day this accident happened he and the driver of the car and his sister had crossed over this intersection during the daytime or at least while it was still light on their way to Albany. He does, however, testify that he did not know the location of the railroad crossing, that he did not see the warning sign or hear any whistle or bell or any other warning.

The automobile was traveling at the rate of 40 miles an hour. The train was traveling at the rate of 1 mile an hour. This is the evidence given by the engineer and the only other evidence in the record is that it was traveling at a slow rate so that the automobile was traveling forty times as fast as the train. The train had crossed 18 feet of the pavement. This is the most advantageous figure as far as the appellee is concerned although many of the witnesses testified that it had completely crossed the pavement. So that during the period of time when the appellee's car was approaching this railroad intersection the train was out on the pavement.

Many nice questions are raised and argued. We find it necessary to pass on only one and do pass on only one. Appellant argues that the court erred in giving its Instruction No. 2 to the jury to which it duly excepted. In this instruction the court copies almost verbatim from the appellee's amended and substituted petition. He sets out in detail the allegations of the plaintiff's petition. It covers better than four pages in the abstract. We quote only a part of the instruction:

"Plaintiff says that while the paved road runs north and south at the crossing, the defendant's track runs in a northwesterly and southeasterly direction; that the defendant's car was headed in a northwesterly direction and that its headlight was directed away from plaintiff when it was close to the paved road; that the headlight was constructed so that its rays were projected forward and so that it was invisible to plaintiff as he approached the crossing, and that whatever light that may have been reflected by dust and vapor in the beam was not discernible to plaintiff.

"Plaintiff says that the forward one-fourth of the defendant's car was taken up with the machinery for propelling the car and that aside from faint lights over the operating controls

no lights were visible from the outside in the forward part of such car, and that lights farther to the rear of defendant's car were not visible to plaintiff until the front end of the car was on the paved portion of the highway.

"Plaintiff says that on the night in question the defendant's car was brought to a stop near the easterly line of the paved road where its presence was concealed from plaintiff by the trees, shrubbery and brush on the defendant's right of way.

"Plaintiff says that defendant's car was then driven onto the highway very slowly and at such speed that it could have been stopped practically instantly by the application of its brakes, without any warning being given by bell or whistle that the car was being driven onto the highway.

"Plaintiff says that the paved road south of the crossing was straight and level for a distance of 2000 feet; that the operator of defendant's car was stationed in the darkened front end of the car and saw, or in the exercise of reasonable care could have seen the automobile approaching the crossing and knew, or in the exercise of reasonable care should have known, that the presence of the defendant's car was unknown to the occupants of the automobile, and knew that if the car was driven onto the pavement the automobile could not be stopped before colliding with the car, and that the operator of defendant's car failed to apply the brakes of the car and bring it to a stop but drove it into the pathway of the automobile on the pavement.

"Plaintiff says that he was at all times immediately prior to and at the time of such collision in the exercise of due care and caution, and that said collision and resulting injuries to him were not caused by any negligence on his part, but that said collision and injuries were caused by the negligence of said defendant in the following particulars:

"(a) That without giving any warning of the presence of the defendant's car, or of their intention to operate said car over said highway, the defendant's employees drove said car onto said highway and into the path of the automobile in which plaintiff was riding when such automobile was approaching so close to the defendant's track that the driver of such automobile could not stop it before colliding with defendant's car and

when said automobile was so close to defendant's track that plaintiff could not learn of the presence of defendant's car and warn the driver of the automobile of the presence of defendant's car and the danger of collision in time to enable the driver of the automobile to stop the automobile before colliding with defendant's car.

"(b) That the employees of the defendant in charge of said motor car failed to look along the said highway to the south to ascertain whether said motor car could be driven onto the highway with reasonable safety before starting said car and driving it onto the highway."

The court in its detailed summary of the allegations of Count I of appellee's petition says that the forward one fourth of the defendant's car was taken up with machinery for propelling the car and that aside from faint lights over the operating control, no lights were visible from the outside. There is of course no evidence to sustain this. The uncontradicted evidence shows the motor compartment was only 8 feet long and 9 feet wide. And there were lights in both the mail, baggage and passenger parts of the car. In fact, the appellee's own witness Scott testified that he observed lights at a distance of 700 feet in the mail compartment of the railroad motorcar. The jury is then told that the lights to the rear of the car were not visible to the appellee. The appellee testified that he did not see the lights in the mail, baggage or passenger compartments and that all he ever saw was a shadow. Then Instruction No. 2 sets out that appellant's agent knew Housenga's automobile was approaching the crossing. That the presence of the railroad car was not known to the occupants of the automobile and that Housenga's car could not be stopped in time to avoid a collision. There is no testimony to sustain these statements as we read this record. Engineer Harmon stated that Housenga's car was not visible as he started over the crossing and that he did not know of the presence of it. Appellee argues that others saw the approach of the car and therefore the engineer of the train should have seen the automobile in which Smith was riding. Appellee forgets that the engineer had to look also to the front of the car and to his right or the north side of the

intersection for approaching automobiles from that direction. The instruction then proceeds to relate appellee's further allegation that despite such knowledge, appellant's motorcar operator drove into the path of the automobile. There being no showing that there was any knowledge on the part of the engineer, this statement was unsupported by the evidence. The court also recited appellee's allegation that the motorcar could have been stopped instantly while crossing the highway but that appellant failed to do so.

The only ground of negligence relied on was the failure to give warning and observe the approaching car before moving over the crossing. And so the statement that the train could have been stopped practically instantly by the application of its brakes was not an issue for the jury to decide.

In Instruction No. 5 the court says:

"5. The claims made by the plaintiff in his substituted and amended petition and the answer made thereto by the defendant, are set forth herein in substance in order to advise you of the nature of the charges which make up the issues of this case. They are not to be considered by you as evidence, but are detailed to you simply to advise you of the claims and issues of the case."

It will be noted in this instruction the court referred to the claims made by the appellee in his petition as constituting "the issues of the case." This court has held that it is error to present to the jury all the allegations set forth in the petition unless there is evidence to support the same. In Veith v. Cassidy, 201 Iowa 376, 377, 207 N. W. 328, the trial court repeated the pleadings almost verbatim, which is as the court did in the instant case, referring to them as "issues and questions in dispute." This was deemed reversible error, the court saying:

"Further complaint is made about the first instruction given, because said instruction copies almost verbatim the petition of appellee and the answer of the appellant, and closes with these words:

"'As to the issues and questions in dispute, as above set forth, the court gives you the following instruction.'

"We have repeatedly condemned this method of stating the issues to a jury. Like all pleadings, those in the instant case contain surplus matter not necessary to a proper pleading. It is the duty of the court, in stating the issues in instructions, to select the material allegations of the pleadings of the parties which make the real issues in the case, and state them in such a way that the jury may understand the exact contentions of the respective parties. To copy the ordinary pleading in full, with the usual elaborations contained therein, and then tell the jury that the issues and questions under dispute are above set forth, permits them to speculate, and possibly turn their decision on a matter which is wholly immaterial, and not an issue in the case. Swanson v. Allen, 108 Iowa 419; Gorman v. Minneapolis & St. L. R. Co., 78 Iowa 509; Robinson & Co. v. Berkey & Martin, 100 Iowa 136.

"In these matters the court erred, and the case is reversed."

The appellee in his brief and argument admits that the submission of unsupported allegations is erroneous but claims that there is sufficient evidence to justify the submission as made by the court. With this we cannot agree. In this case the court after copying almost verbatim from the petition then says to the jury that he has done this for the purpose of advising them of the nature of the charges which make up the issues in this case.

In the case of Disalvo v. Chicago, Rock Island & Pacific Ry. Co., 199 Iowa 868, 874, 200 N. W. 729, 731, 202 N. W. 608, this court said:

"Complaint is made of this method of submission to the jury. The complaint is well founded, and the error should be avoided upon a subsequent trial. The practice of submitting lengthy pleadings to the jury is one which we have strongly disapproved repeatedly. We have tolerated the practice if and when the trial court follows such recital of unproved allegations with an express withdrawal of those that are not sustained by the evidence. The better practice is that unsupported allegations should not be submitted to the jury, even in a statement of issues. If, however, the trial court prefers to include in a statement of issues all the allegations of a pleading, then there ought

288

to be an express and affirmative withdrawal of all allegations which are without support in the evidence.''

In the case at bar there was no withdrawal of the allegations which are without support in the evidence and it will not do to permit the jury to determine whether such allegations were supported by the evidence. This is not the function of a jury and we cannot say whether or not the jury in this case reached its verdict by giving consideration to one or another of these supposed issues which had no support in the testimony. It necessarily follows that this case must be, and it is, hereby reversed.—Reversed.

MILLER, C. J., and OLIVER, BLISS, and GARFIELD, JJ., concur.